**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| SCOTT MCCLAIN,<br><br>　　　Plaintiff,<br><br>v.<br><br>TODD BLANCHE, in his official capacity as Acting Attorney General of the United States,<br><br>THE UNITED STATES DEPARTMENT OF JUSTICE,<br><br>TERRANCE C. COLE, in his official capacity as Administrator of the United States Drug Enforcement Administration,<br><br>THE UNITED STATES DRUG ENFORCEMENT ADMINISTRATION,<br><br>　　　Defendants. | Civil Action No. _____ |

## COMPLAINT

Plaintiff SCOTT MCCLAIN ("Plaintiff"), by and through his undersigned counsel, brings this Complaint against Defendant TODD BLANCHE, in his official capacity as Acting Attorney General of the United States, THE UNITED STATES DEPARTMENT OF JUSTICE ("DOJ"), TERRANCE C. COLE, in his official capacity as Administrator of the United States Drug Enforcement Administration, and THE UNITED STATES DRUG ENFORCEMENT ADMINISTRATION ("DEA") (collectively, "Defendants"). In support thereof, Plaintiff states as follows:

1

## NATURE OF THE ACTION

1.  This is a civil action for declaratory and injunctive relief under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, and the Due Process Clause of the Fifth Amendment to the United States Constitution. Plaintiff challenges the DEA's issuance of an Immediate Suspension Order (the "ISO"), attached hereto as Exhibit A, that summarily suspended his DEA Certificate of Registration ("COR") without prior notice, without a hearing, and without any lawful finding that his continued registration presents an "imminent danger to the public health or safety," as 21 U.S.C. § 824(d) requires.

2.  Plaintiff is a licensed Physician Assistant working under the supervision of physicians at a large national chain of clinics that specialize in testosterone replacement therapy ("TRT") and related men's health services. In the course of his practice, Plaintiff treats men suffering from testosterone deficiency, a recognized medical condition also known as hypogonadism. Under appropriate clinical conditions—and guided by his employer's policies and procedures for the treatment of testosterone deficiencies—Plaintiff prescribes TRT to such patients.

3.  TRT is a well-established, mainstream medical treatment employing FDA-approved testosterone medications. Congress and the DEA have classified testosterone in Schedule III of the Controlled Substances Act, reflecting testosterone's currently accepted medical use and its comparatively low potential for abuse.

4.  On or about May 27, 2026, the DEA cast aside the ordinary administrative process that Congress prescribed and issued the ISO, immediately stripping Plaintiff of his authority to prescribe any controlled substance. The ISO rests entirely on the opinion of a single, unnamed DEA-retained expert that Plaintiff's prescribing of testosterone to four patients deviated from the

2

standard of care. To date, the DEA has refused to identify its expert, indicating that the expert's identity will be disclosed to Plaintiff only when the DEA is required to do so in a prehearing statement ordered by the Administrative Law Judge ("ALJ"). The ISO alleges no drug diversion, no fraudulent prescribing, and no documented harm to any patient.

5. Congress authorized immediate suspension without a prior hearing only in a narrow class of genuine emergencies: where there is "a substantial likelihood of an immediate threat that death, serious bodily harm, or abuse of a controlled substance will occur" absent suspension. 21 U.S.C. § 824(d)(2). The ISO recites the statutory phrase "imminent danger," 21 U.S.C. § 824(d)(1)-(2), but it makes no factual findings that could satisfy that demanding standard. None exist.

6. The most current and rigorous scientific evidence—including the landmark TRAVERSE trial and the FDA's ensuing revisions to testosterone product labeling—has refuted the outdated cardiovascular and prostate concerns that once surrounded TRT.

7. At best, the ISO reflects a post hoc, threadbare file review by a DEA-retained expert about the valid treatment of four patients by Plaintiff.

8. By contrast, in support of its Motion for a Temporary Restraining Order and Preliminary Injunction, filed simultaneously with this Complaint, Plaintiff provides a declaration from the leading expert on TRT, who flatly refutes any deviation by Plaintiff from the usual course of professional practice and who asserts that Plaintiff's TRT prescriptions were for a legitimate medical purpose, in the usual course of professional practice, and posed absolutely no danger to public health and safety.

9. The ISO therefore rests on DEA's incorrect view of the underlying science and medicine of TRT. The ISO manufactures an emergency. There is none. The leading TRT

3

physician in the United States has reviewed the medical records of the four patients identified in the ISO ("Patient Files") and found neither a deviation from the standard of care nor any cognizable risk of harm.

10.    Against this backdrop, the DEA is attempting to use the ISO to contest, at most, disagreements about medical judgment and transform the ISO process into something neither intended by Congress nor sanctioned by the Constitution: bypassing Plaintiff's due process rights.

11.    The ISO intrudes upon terrain Congress never assigned to the DEA: the regulation of the practice of medicine and standards of medical care, which are matters entrusted to state medical regulators.  By equating a difference in clinical judgment concerning a Schedule III medication with unlawful prescribing, the DEA has exceeded its statutory authority.

12.    The consequences of this factually and legally unsupported ISO for Plaintiff are immediate, severe, and irreparable.  He cannot prescribe any controlled substance; his patients' ongoing courses of treatment have been interrupted without warning; and his professional livelihood and reputation have been placed in jeopardy.  Plaintiff has been placed on administrative leave and cannot treat patients.  Further, his mental health has declined significantly as a result of the ISO.  Meanwhile, by the statute's own terms, the suspension remains in effect until "the conclusion of such proceedings, including judicial review thereof"—a process that can take an indeterminate amount of time.  21 U.S.C. § 824(d)(1).  At the time of this filing, Plaintiff's administrative hearing has not even been scheduled; only a scheduling conference has been set before the ALJ for August 12, 2026.  Until the hearing and any judicial review thereof takes place, Plaintiff will continue to suffer these substantial and irreparable harms.

13.    Accordingly, Plaintiff brings this action to have the ISO declared unlawful, stayed, set aside, vacated, and dissolved pursuant to 5 U.S.C. §§ 705 and 706 and 21 U.S.C. § 824(d)(1), and to enjoin Defendants from enforcing it.

**PARTIES**

14.    Plaintiff McClain is a natural person and a resident of Fort Washington, Pennsylvania.  Plaintiff is a Physician Assistant licensed by the Pennsylvania State Board of Medicine.  Plaintiff is registered with the DEA as a mid-level practitioner authorized to handle controlled substances under COR No. MM1115446.  Since November 2022, Plaintiff has been employed at Company-1, a chain of clinics providing TRT, among other treatments.

15.    Defendant Todd Blanche is named in his official capacity as the Acting Attorney General of the United States.  Under 21 U.S.C. § 824(d), it is the Attorney General who is given the authority to "suspend any registration simultaneously with the institution of proceedings under this section, in cases where he finds that there is imminent danger to the public health or safety." The Attorney General has delegated that authority to the DEA Administrator.  *See* 28 C.F.R. § 0.100.  The Attorney General's address is 950 Pennsylvania Avenue, Northwest, Washington, D.C. 20530.

16.    Defendant DOJ is an executive department of the United States.  *See* 5 U.S.C. § 101; 28 U.S.C. § 501.  The head of the DOJ is the Attorney General (or, as relevant here, the Acting Attorney General).  *See* 28 U.S.C. § 503.  The DOJ is considered an agency of the government for purposes of the Administrative Procedure Act ("APA").  *See* 5 U.S.C. § 701(b)(1). The DOJ is located at 950 Pennsylvania Avenue, Northwest, Washington, D.C. 20530.

17.    Defendant Terrance C. Cole is named in his official capacity as Administrator of the DEA. The authority to implement the regulations of the Controlled Substances Act, 21 U.S.C.

5

§§ 801 *et seq.* ("CSA"), has been delegated to Administrator Cole by the Attorney General of the United States. *See* 28 C.F.R. § 0.100. The Administrator of the DEA reports to the Attorney General. *See* 28 C.F.R. § 0.102. Administrator Cole's address, the DEA Headquarters, is located at 600 Army Navy Drive, Arlington, Virginia 22202.

18. Defendant DEA is a component of DOJ and was created by Executive Order 11,727. *See* 38 Fed. Reg. 18,357 (July 10, 1973). The DEA is considered an agency of the government for purposes of the APA. *See* 5 U.S.C. § 701(b)(1). The DEA is located at 600 Army Navy Drive, Arlington, Virginia, 22202.

## JURISDICTION AND VENUE

19. This action arises under the United States Constitution, the CSA, and the APA, 5 U.S.C. §§ 701–706. The Court has subject matter jurisdiction under 28 U.S.C. § 1331. The Court has authority to provide the non-monetary relief sought herein pursuant to 5 U.S.C. §§ 702, 705, and 706.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(C) because this is an action against officers and agencies of the United States, Plaintiff resides in this District, and no real property is involved in the action. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events giving rise to the claim occurred within this District, to wit: Plaintiff prescribed testosterone to patients at Company-1 in this District.

## FACTUAL ALLEGATIONS

### I. Regulatory Scheme

21. Congress enacted the CSA to establish a comprehensive federal framework governing the manufacture, distribution, dispensing, possession, importation, and exportation of designated drugs and chemicals. 21 U.S.C. §§ 801 *et seq.*

6

22.    A person who prescribes controlled substances may do so only if they hold a valid registration issued under the authority of the Attorney General and DEA. *See* 21 U.S.C. §§ 822, 802(10).

23.    The DEA is responsible for enforcing the regulations of the CSA in order "to ensure a sufficient supply of controlled substances for medical, scientific, and other legitimate purposes, and to deter the diversion of controlled substances for illicit purposes." *See* 88 Fed. Reg. 74, 379 (Oct. 31, 2023).

24.    Acting under authority delegated by the Attorney General, the DEA may revoke, restrict, or suspend a registrant's COR on several statutory grounds, including based upon a finding that the registrant "has committed such acts as would render his registration . . . inconsistent with the public interest." 21 U.S.C. § 824(a). As a general rule, the agency must first give the registrant notice and an opportunity to be heard before taking such action against its COR. *See id.* § 824(c).

25.    In narrow circumstances, the DEA may bypass these ordinary procedural protections and issue an ISO without advance notice or a pre-deprivation hearing—but only upon a finding that the registrant's continued registration presents an "imminent danger to the public health or safety." *Id.* § 824(d). The statute provides in full:

> (1) The Attorney General may, in his discretion, suspend any registration simultaneously with the institution of proceedings under this section, in cases where he finds that there is an imminent danger to the public health or safety. A failure to comply with a standard referred to in section 823(h) of this title may be treated under this subsection as grounds for immediate suspension of a registration granted under such section. A suspension under this subsection shall continue in effect until the conclusion of such proceedings, including judicial review thereof, unless sooner withdrawn by the Attorney General or dissolved by a court of competent jurisdiction.

> (2) In this subsection, the phrase "imminent danger to the public health or safety" means that, due to the failure of the registrant to maintain effective controls against diversion or otherwise comply with the obligations of a registrant under this

subchapter or subchapter II, there is a substantial likelihood of an immediate threat that death, serious bodily harm, or abuse of a controlled substance will occur in the absence of an immediate suspension of the registration. 21 U.S.C. § 824(d).

26.     The CSA further authorizes the DEA to tailor any such action to the substances actually at issue: "[t]he Attorney General may limit revocation or suspension of a registration to the particular controlled substance . . . with respect to which grounds for revocation or suspension exist." 21 U.S.C. § 824(b); *see also* 21 C.F.R. § 1301.36(g). Thus, even where DEA identifies concerns limited to a single controlled substance, the agency retains discretion to leave the remainder of a clinic's registration intact rather than suspend its authority as to all controlled substances.

27.     Notably, the DOJ and DEA's authority under the CSA does not extend to regulation of the practice of medicine and standards of medical care, which fall within the authority of state medical regulators.

## II.    Testosterone Replacement Therapy

### a.    *Medical Use of Testosterone Replacement Therapy*

28.     Testosterone is a naturally occurring androgen, a steroid hormone essential to the development and maintenance of male reproductive tissue and secondary sex characteristics and to the regulation of bone density, muscle mass, red-blood-cell production, mood, cognition, and sexual function.

29.     In some men, the body does not produce adequate amounts of testosterone. When this deficiency gives rise to characteristic signs or symptoms, the resulting condition is known as hypogonadism or testosterone deficiency. Hypogonadism may be congenital or acquired and may arise from a disorder of the testes (primary hypogonadism), the pituitary gland or hypothalamus (secondary hypogonadism), or a combination of both.

8

30.    The recognized clinical signs and symptoms of testosterone deficiency include fatigue, diminished libido, erectile dysfunction, loss of muscle mass and strength, increased body fat, depressed mood, and a reduced sense of well-being. Untreated testosterone deficiency may be associated with adverse long-term health consequences, including reduced bone mineral density and anemia, cardiovascular disease, obesity, diabetes, and increased mortality.

31.    TRT involves the use of medications, most commonly exogenous testosterone, intended to alleviate the signs and symptoms of testosterone deficiency by increasing testosterone levels, usually within the physiological range. TRT is a well-established, long-standing, evidence-based, and mainstream medical treatment for men with testosterone deficiency.

32.    The U.S. Food and Drug Administration ("FDA") has approved testosterone products for TRT in adult males with hypogonadism associated with certain medical conditions resulting in a deficiency or absence of endogenous testosterone. Approved testosterone products are available in a range of formulations, including intramuscular and subcutaneous injections (such as testosterone cypionate and testosterone enanthate), transdermal gels and patches, subcutaneous pellets, and oral formulations.

### b.    Testosterone is a Schedule III Controlled Substance

33.    Testosterone is a Schedule III controlled substance under the CSA. *See* 21 U.S.C. § 812(c), Schedule III; 21 U.S.C. § 802(41); 21 C.F.R. § 1308.13(f).

34.    By placing testosterone in Schedule III rather than in Schedule I or II, Congress and the DEA have recognized that testosterone has a currently accepted medical use in treatment in the United States and a potential for abuse lower than that of the substances listed in Schedules I and II. *See* 21 U.S.C. § 812(b)(3).

9

35. A practitioner who holds a valid DEA registration may lawfully prescribe and dispense testosterone, provided the prescription is issued for a legitimate medical purpose by a practitioner acting in the usual course of professional practice. 21 C.F.R. § 1306.04(a).

### c. Current Scientific Evidence on Safety and Effectiveness of TRT

36. The scientific understanding of TRT has advanced substantially in recent years and new studies have challenged outdated beliefs regarding the risks associated with testosterone, including cardiovascular and prostate risks.

37. The largest and most rigorous study of the cardiovascular safety of TRT to date— the TRAVERSE trial—involved more than 5,200 men across hundreds of clinical sites, and was conducted by investigators affiliated with leading research institutions, including the Cleveland Clinic, Harvard Medical School, Boston University School of Medicine, and the Duke Clinical Research Institute. *See* A.M. Lincoff et al., Cardiovascular Safety of Testosterone-Replacement Therapy, 389 New Eng. J. Med. 107 (2023), attached hereto as Exhibit B.

38. TRAVERSE results demonstrated no greater risk of cardiovascular death, nonfatal myocardial infarction, and nonfatal stroke for TRT compared to placebo. The TRAVERSE trial also found nearly identical rates of prostate cancer between groups—12 cases in the testosterone arm versus 11 in the placebo arm—and a recent review of the broader literature is consistent with that finding. The scientific evidence does not support the once-prevalent concern that TRT increases the risk of prostate cancer.

39. Recent scholarship in the field of urology has concluded that the assertion that raising serum testosterone endangers the prostate is, in the authors' words, "categorically false," and has called for closing what those authors describe as a "bizarre chapter in medical history" in which a repeatedly disproven concept long misinformed regulatory guidance, clinical practice, and

10

medical education. *See* A. Morgentaler & A. Traish, *Testosterone Does Not Drive Prostate Cancer: Presenting the New Framework of Androgen Adequacy vs Inadequacy*, 215 J. Urol. 688, 689, 692 (2026), attached hereto as Exhibit C.

40.     Federal regulators have acted on this evolving evidence. Following the TRAVERSE trial, on February 28, 2025, the FDA announced class-wide labeling changes for all testosterone products and removed from the Boxed Warning the language concerning an increased risk of adverse cardiovascular outcomes. *See* FDA, FDA Issues Class-Wide Labeling Changes for Testosterone Products (Feb. 28, 2025) (available at https://www.fda.gov/drugs/drug-alerts-and-statements/fda-issues-class-wide-labeling-changes-testosterone-products (last visited July 16, 2026)).

41.     The FDA and the U.S. Department of Health and Human Services ("HHS") have continued efforts to conform federal guidance to the current science.

42.     On December 10, 2025, the FDA convened an expert panel of urologists and health officials who made a set of recommendations to the FDA about how to update its testosterone label. *See* FDA Expert Panel on Testosterone Replacement Therapy for Men (Dec. 10, 2025) (*available at* https://www.fda.gov/patients/fda-expert-panels/fda-expert-panel-testosterone-replacement-therapy-men-12102025 (last visited July 16, 2026)). Among the panel's recommendations was a call to eliminate the FDA's current restriction of indicated use to specific underlying conditions, and its restrictions of use on patients with age-related hypogonadism. Neither of those restrictions is endorsed by any major society guidelines, which require only the presence of characteristic signs or symptoms together with documented low testosterone, regardless of underlying etiology. *Id.* Men who present with signs and symptoms of testosterone deficiency may benefit from treatment regardless of underlying etiology.

11

43.    In April 2026, the FDA published a Federal Register notice inviting sponsors to pursue expanded TRT indications for idiopathic hypogonadism with the specific symptom of decreased libido.    *See* Docket No. FDA-2025-N-6743 (available at https://www.regulations.gov/docket/FDA-2025-N-6743 (last visited July 16, 2026)).

44.    On June 18, 2026, HHS and the FDA proposed further labeling revisions to reflect current clinical evidence regarding the safety and efficacy of TRT.   *See* HHS Announces Requested Updates to Testosterone Therapy Product Labels (*available at* https://www.hhs.gov/press-room/fda-requests-updates-testosterone-therapy-labeling.html)   (last visited July 16, 2026).  The proposed changes would: (i) remove the current limitation of use stating that the safety and effectiveness of TRT in men with age-related hypogonadism have not been established; (ii) remove language suggesting testosterone use increases prostate cancer risk; and (iii) remove warnings that TRT may worsen symptoms of benign prostatic hyperplasia, also known as an enlarged prostate.

45.    Indeed, HHS and FDA leadership have publicly affirmed the science-backed safety and efficacy of TRT, emphasizing that the scientific understanding of TRT has evolved and that prescribing guidance should reflect that evolution to support informed medical decision-making.

### d.  Prescribing TRT:  Guidelines and Clinical Judgment

46.    There is broad consensus that testosterone therapy is indicated for men with characteristic signs and/or symptoms of testosterone deficiency, combined with low levels of testosterone.  Areas where there is a lack of consensus include specific thresholds for what constitutes a low level of testosterone.  Several professional societies, including the Endocrine Society and the American Urological Association ("AUA"), have published guidelines addressing testosterone deficiency.  These guidelines, however, differ in material respects, including the appropriate diagnostic threshold and the role of patient symptoms relative to laboratory values.

These guidelines are, by their own terms, advisory only. They do not purport to establish a mandatory standard of care and expressly contemplate and defer to the individualized clinical judgment of the treating practitioner. For example, the Endocrine Society's Clinical Practice Guideline states that its guidelines "should not be considered inclusive of all proper approaches or methods, or exclusive of others," that they "cannot guarantee any specific outcome, nor do they establish a standard of care," and that "treatment decisions must be made based on the independent judgment of health care providers and each patient's individual circumstances." Bhasin S. et al., *Testosterone Therapy in Men with Hypogonadism: An Endocrine Society Clinical Practice Guideline*, 103 J. Clin. Endocrinol. Metab. 1715, 1717-18 (May 2018), attached hereto as Exhibit D.

47.     Although the principal guidelines share a common diagnostic framework—each recommending both the presence of clinical signs or symptoms and biochemical evidence of low serum testosterone (*i.e.*, a blood test for testosterone levels)—they differ materially from one another in their particulars. Most notably, these guidelines differ as to the serum testosterone threshold used to support a diagnosis of testosterone deficiency. No single, universally accepted serum-testosterone threshold exists.

48.     Proposed values for the threshold for low testosterone vary widely. For example, the AUA employs a threshold of 300 ng/dL. *See* J. Mulhall et al., *Evaluation and Management of Testosterone Deficiency: AUA Guideline*, 200 J. Urol. 423, 424 (2018), attached hereto as Exhibit E. In other words, if a patient's blood test shows total testosterone below 300 nanograms per deciliter, the AUA guidelines classify such a result as a low-testosterone level. The European Association of Urology employs a threshold of approximately 350 ng/dL (12 nmol/L), below which a patient is a potential candidate for TRT. *See* A. Salonia et al., European Association of

Urology, *EAU Guidelines on Sexual and Reproductive Health* § 3.3.5, at 19 (2025 limited update), excerpt attached hereto as Exhibit F. The Endocrine Society recommends a threshold of 264 ng/dL. *See* Ex. D, at 1721. An article published in the Journal of Urology, moreover, suggested age-stratified cutoffs as high as 409 ng/dL in younger men. *See* Zhu et al., *What Is a Normal Testosterone Level for Young Men? Rethinking the 300 ng/dL Cutoff for Testosterone Deficiency in Men 20-44 Years Old*, 208 J. Urol. 1295, 1298 (2022), attached hereto as Exhibit G. The wide range of thresholds proposed by different medical groups underscores the lack of consensus on any specific value being definitive in evaluating testosterone deficiency.

49.     Further, serum testosterone levels (*i.e.*, blood-test results) are inherently variable: they fluctuate diurnally and from day to day, and no single laboratory value reliably distinguishes patients who will benefit from TRT from those who will not. For this reason, and because patients with similar laboratory values may present with markedly different signs and symptoms, it is common, expected, and clinically appropriate for practitioners to exercise judgment—including through adjunctive testing, and consideration of symptoms—in determining whether and how to treat a given patient, and to titrate therapy over time based on the patient's clinical response.

50.     The guidelines are intended to support, not to supplant, the exercise of clinical judgment. The European Association of Urology recognizes, "[h]ypogonadism may be more subtle and not always evident by low testosterone levels." Eur. Ass'n of Urology, *EAU Guidelines on Male Hypogonadism* § 4.1, at 11 (2019), attached hereto as Exhibit H. Consistent with this, international expert recommendations provide that TRT "may be reasonably offered to symptomatic men with testosterone concentrations higher than 12 nmol/L [350 ng/dL] based on clinical judgment." Lunenfeld et al., *Recommendations on the Diagnosis, Treatment and Monitoring of Hypogonadism in Men*, 18 Aging Male 5, 7 (2015), attached hereto as Exhibit I.

14

51.    Accordingly, the decision whether to prescribe TRT, the selection of the diagnostic threshold applied, and the choice of formulation, dosage, and monitoring regimen all fall within a zone of legitimate clinical judgment, as to which reasonable, qualified practitioners may and do differ. The exercise of that clinical judgment in prescribing TRT to a patient with the signs and symptoms of testosterone deficiency is the practice of medicine, not evidence of diversion or of prescribing outside the usual course of professional practice.

**III.    Plaintiff's Role at Company-1**

52.    Company-1 is a national chain of clinics specializing in TRT and related men's health services.

53.    Company-1 was established nearly twenty years ago and has since grown to operate more than 65 locations across the United States.

54.    Company-1 has hundreds of employees, including a compliance team and medical professionals, such as physicians, registered nurses, and physician assistants.

55.    Plaintiff has been employed as a Physician Assistant at Company-1's Langhorne clinic for approximately four years.  Until Plaintiff was placed on administrative leave on July 17, 2026, as a result of the ISO at issue in this Complaint, Plaintiff worked under the supervision of a physician and his duties included treating men suffering from testosterone deficiencies, including by prescribing TRT when clinically appropriate.

56.    Plaintiff works within a team of medical professionals and in accordance with Company-1's policies and procedures concerning TRT.  Indeed, the patients named in the DEA's ISO were prescribed TRT not only by Plaintiff, but also by a number of other practitioners working at Company-1.

57.     Prior to joining Company-1, Plaintiff worked at numerous other medical offices as a physician assistant, including urgent care practices, acute rehabilitation facilities, and extensively in hospital settings in emergency rooms.

58.     Prior to this action, Plaintiff had never had any adverse action taken on any license associated with his medical practice. Nor had he been investigated by any licensing or regulatory authority during his time as a physician assistant.

### IV.     The DEA's Meritless ISO

59.     On or about May 27, 2026, before any administrative hearing and without prior notice to Plaintiff, the DEA issued the ISO suspending Plaintiff's DEA registration pursuant to 21 U.S.C. § 824(d).

60.     The ISO's finding that Plaintiff's continued registration presents an imminent danger is unsupported by any adequate factual basis. Although the ISO cites 49 Pa. Code § 16.92(a)(1) and (a)(4) as the source of the standard of care Plaintiff allegedly violated, it rests the suspension of Plaintiff's registration entirely on a generic allegation that, according to the opinion of a single, unnamed medical expert retained by the DEA, Plaintiff's prescribing of testosterone to four identified patients deviated from that standard of care and was not for a legitimate medical purpose.

61.     The ISO then concludes, again with no support, that Plaintiff's prescribing of testosterone "in violation of the standard of care poses an 'imminent danger' within the meaning of 21 U.S.C. § 824(d)."

62.     At most, the ISO reflects nothing more than the DEA's disagreement with Plaintiff's clinical judgment, not any evidence of unlawful prescribing.

63. Indeed, the leading medical expert in the field of TRT, Abraham Morgentaler, M.D., has reviewed the Patient Files and concluded that Plaintiff's prescription of TRT for the four patients identified in the ISO was appropriate—*i.e.*, for a legitimate medical purpose, and within the usual course of professional practice. Dr. Morgentaler is a Harvard-trained, leading international figure in the fields of testosterone therapy, prostate cancer, and male sexuality.

64. For each patient, Dr. Morgentaler considered the presenting signs and symptoms, the physical examination performed, the patient's consent, the laboratory testing ordered and reported, the diagnosis made and documented, the treatment prescribed, and the subsequent monitoring and reassessment reflected in the records.

65. Dr. Morgentaler concluded that:

a. Plaintiff's use of TRT for each of the four patients was for a legitimate medical purpose and Plaintiff acted in the usual course of professional practice. Plaintiff's prescribing of TRT to each of the four patients was reasonable and appropriate in light of the presenting signs and symptoms and the diagnoses documented in the Patient Files.

b. Plaintiff and his clinical team appropriately evaluated each patient, adjusted therapy as clinically indicated, and monitored the patients' response to treatment.

c. The documentation in the Patient Files, including that of Plaintiff, for each of the four patients was more than sufficient for this practice area. The medical documentation in the Patient Files reflecting medical histories, physical examinations, diagnoses, and monitoring was consistent with reasonable medical practice among practitioners treating testosterone deficiency.

17

d. None of the four patients were subjected to any immediate risk of death, serious bodily harm, or abuse of a controlled substance as a result of Plaintiff's prescribing of TRT.

e. Each patient presented with recognized signs and symptoms of testosterone deficiency, each patient's course of treatment was consistent with the legitimate management of that condition, and each patient benefited from TRT.

f. No basis exists to conclude, as the ISO alleges, that there is any "substantial likelihood of an immediate threat that death, serious bodily harm or abuse of a controlled substance will occur" based on the TRT prescriptions of Plaintiff in the Patient Files.

g. The DEA's issuance of the ISO in this case was not supported by, and is inconsistent with, the current science and the clinical practice in this field.

66. Further, the Patient Files show that Plaintiff was only one of several providers treating the patients. Each patient in the ISO was also prescribed TRT by a number of other practitioners in the course of each patient's documented treatment at Company-1 in and around the time of Plaintiff's prescriptions to each patient, as reflected in the Patient Files.

67. Critically, the ISO offers no factual analysis explaining how the disputed prescribing decisions involving four patients created an immediate threat requiring summary suspension before any hearing could occur.

68. As explained above, an immediate suspension order is lawful only upon a finding of "an imminent danger to the public health or safety," defined as a "substantial likelihood of an immediate threat that death, serious bodily harm, or abuse of a controlled substance will occur" absent suspension. 21 U.S.C. § 824(d).

18

69.     The ISO provides absolutely no explanation for its assertion that Plaintiff's prescribing poses an imminent danger.

70.     The high bar set in the statutory definition—a substantial likelihood of an immediate threat that death, serious bodily harm, or abuse of a controlled substance will occur—is one the DEA has not met and cannot meet considering the current scientific evidence concerning TRT.

71.     As explained above, the only conceivable risks that would justify the harm required for issuance of an ISO—cardiovascular and prostate risk—have been disproven through recent large-scale scientific studies.

72.     Unlike cases involving drug diversion, fraudulent prescriptions, or conduct that demonstrably endangers patients, the allegations here concern disputed treatment decisions supported by competing expert opinions. The DEA's statutory authority does not permit it to dispense with the ordinary administrative process under those circumstances.

## V.     The Parties' Conduct After the Issuance of the ISO

73.     Upon receipt of the ISO, Plaintiff, through counsel, promptly contacted the DEA to: (i) seek a negotiated resolution that would allow Plaintiff to retain his DEA registration while addressing any legitimate concerns the DEA might have regarding his prescribing practices; and (ii) obtain clarification from the DEA as to the purported factual basis for the ISO.

74.     In these discussions, the DEA declined to identify the medical expert on whose opinion the ISO rests, declined to explain what, specifically, Plaintiff was alleged to have done or failed to do with respect to any of the four patients identified in the ISO, and declined to indicate what imminent danger it believed Plaintiff's continued registration posed.

75.     Tellingly, when asked to identify the relevant guidelines that DEA's expert referenced in reviewing the patient files subject to the ISO, DEA counsel declined to provide that information and noted that counsel could "Google" that information. *See* Exhibit J (Plaintiff's July 15, 2026 Letter to DEA).

76.     On July 15, 2026, despite having committed no wrongdoing, Plaintiff also offered to execute a Memorandum of Agreement ("MOA") with the DEA to resolve the pending ISO. *Id.* Plaintiff's proposed MOA set forth terms that Plaintiff would be required to follow, including continuing medical education and steps Plaintiff would be required to take with each patient before prescribing controlled substances. *Id.* In the same communication, Plaintiff reiterated his request for the DEA to clarify its basis for the suspension. *Id.*

77.     On July 17, 2026, the DEA rejected Plaintiff's proposed MOA, stating that the MOA "must impose restrictions and requirements beyond what a registrant would already be required to do either under the laws of his state and/or the Controlled Substances Act and DEA regulations." *See* Exhibit K (DEA's July 17, 2026 Letter to Plaintiff). In other words, the DEA will accept no resolution unless Plaintiff binds himself to restrictions addressing deficiencies the DEA refuses to identify and that do not exist.

78.     In response to Plaintiff's assertion that the ISO failed to identify the standard of care he was alleged to have violated, counsel for the DEA simply stated in writing that "the [ISO] references Pennsylvania state law and regulations, including a citation to 49 Pa. Code § 16.92(a)(1), identifying the various examinations a practitioner must conduct before prescribing controlled substances," and that "the [ISO] further identifies areas in which DEA's investigation and its independent medical expert determined that [Plaintiff] failed to meet the standard of care under Pennsylvania law." *Id.*

20

79.     The cited regulation, 49 Pa. Code § 16.92(a), together with subsection (a)(4), which the ISO also invokes, identifies five broad categories of examination and documentation obligations that apply to any Pennsylvania practitioner who prescribes controlled substances: (i) performing adequate physical examinations, (ii) recording an appropriate history, (iii) making and documenting appropriate diagnoses, (iv) documenting a legitimate medical purpose, and (v) periodically reassessing the effectiveness of treatment. As to each of the four patients identified in the ISO, the ISO asserts, without further elaboration, that Plaintiff failed to satisfy one or more of these five categories. *See* Ex. A.

80.     Even accepting this citation at face value, it does not identify, for any of the four patients, what examination was purportedly inadequate and why, what history was allegedly omitted, what diagnosis was supposedly incorrect or undocumented, in what respect the documented medical purpose fell short, or when and how Plaintiff should have reassessed treatment. Nor does it explain how any such documentation-based shortcoming—rather than, for example, a complete absence of examination, diagnosis, or medical rationale—creates a substantial likelihood of an immediate threat of death, serious bodily harm, or abuse of a controlled substance, as 21 U.S.C. § 824(d)(2) requires.

81.     Most importantly, as set forth above, Dr. Morgentaler, a leader in the TRT field, disagreed with the ISO's findings that Plaintiff's examinations and documentation were inadequate. Dr. Morgentaler found, among other things, that Plaintiff's treatments were reasonable in light of the presenting signs and symptoms, that Plaintiff and his team appropriately evaluated each patient, and that the documentation in the patient files was more than sufficient for Plaintiff's practice area. He also found that there was no imminent danger to patients, considering

not only Plaintiff's patient care, but also the current scientific evidence on the safety and efficacy of TRT.

82.     The DEA's letter stated that Plaintiff's arguments concerning the available science on TRT and its bearing on "the Administrator's imminent danger assessment" are "the very types of claims that will be tested through the hearing's fact-finding process." *See* Ex. K. By its own account, then, the DEA treats the governing standard of care and the medical significance of any documentation deficiencies as genuinely disputed factual questions suitable for a hearing—not as undisputed facts capable of supporting the extraordinary, pre-hearing conclusion that Plaintiff's continued registration poses an imminent danger to the public.

## VI.    Harms Resulting from ISO

83.     The harms from the ISO have been significant, immediate, and ongoing, and if not stopped, will be irreparable.

84.     The ISO has caused Plaintiff significant emotional distress. A suspension order on Plaintiff's record may preclude him from working as a physician assistant in any future capacity, as he would be viewed as high-risk not only by prospective employers, but also by any malpractice insurance carriers with whom he might need to work. This elevated-risk designation could result in higher insurance premiums that Plaintiff may be unable to afford or could lead a future employer to decline to hire Plaintiff in favor of another candidate perceived as lower-risk and less costly to insure. The prospect of this outcome has caused Plaintiff significant anxiety about his future, as well as panic attacks and depression.

85.     The ISO has also impeded Plaintiff's ability to practice as a licensed physician assistant, a license under which he has practiced for the last 23 years in the Commonwealth of Pennsylvania. Because the ISO suspended Plaintiff's authority to prescribe or dispense any

controlled substance—not only testosterone—Plaintiff is no longer able to perform the core functions of his position at Company-1. Indeed, Company-1 placed Plaintiff on administrative leave, effective July 17, 2026.

86.     Given the ISO, Plaintiff is also unable to obtain employment in his previous position as a physician assistant at any hospital's emergency room in the Commonwealth of Pennsylvania.

87.     Given Plaintiff's current administrative leave at Company-1, Plaintiff can neither treat patients in any capacity nor prescribe testosterone as part of a TRT plan of care. Plaintiff's patients—including men who had been receiving ongoing TRT under Plaintiff's care—have had their treatment disrupted. Over 200 patients on TRT were treated at Plaintiff's clinic each week. The care of these patients has been profoundly disrupted. Many of these patients were referred to other Company-1 clinics, but the necessary travel has proved too difficult for a large portion of them. Some of these patients are no longer receiving care, while others are having to build new relationships with new teams of providers.

88.     The suspension has also caused serious harm to Plaintiff's professional reputation. A summary suspension, like the ISO, signals to others in the profession that the practitioner engaged in drug diversion or unlawful prescribing. Plaintiff has done neither.

89.     Although Company-1 has, to date, continued to pay Plaintiff's salary despite the ISO, Plaintiff does not know how long that will continue. Plaintiff's ability to remain employed, and his standing in his profession, depend on his authority to prescribe controlled substances and to maintain an unblemished medical record. Each passing day under the ISO erodes both.

90.     As of the date of this filing, DEA has not set a hearing date for the ISO. When Plaintiff's counsel asked DEA counsel when DEA counsel expected that the ISO would be

23

calendared for a hearing, DEA counsel advised that the ISO would be calendared "later this year" and posited a hearing could be scheduled in October or November—in other words, four or five months after the issuance of the ISO. And the harm from the ISO may not end there: the statute provides that the suspension remains in effect until "the conclusion of such proceedings, *including judicial review thereof*." 21 U.S.C. § 824(d)(1) (emphasis added).

## COUNT I

### ARBITRARY AND CAPRICIOUS AGENCY ACTION (5 U.S.C. § 706(2))

91.    Plaintiff incorporates by reference the allegations at paragraphs 1 through 90 as though fully set forth herein.

92.    The APA directs a reviewing court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The DEA's ISO is made reviewable by statute and subject to immediate judicial review. *See* 21 U.S.C. § 824(d)(1).

93.    Defendants' actions in issuing the ISO were arbitrary and capricious. Defendants failed to consider important aspects of the alleged problem, failed to provide adequate justification for the ISO, and failed to consider more narrow scopes of action they could have taken to alleviate the harm on the public and on Plaintiff.

94.    The ISO fails to make the findings that 21 U.S.C. § 824(d) requires. It asserts, in wholly conclusory fashion, that Plaintiff's prescribing "poses an 'imminent danger,'" but it identifies no facts establishing a substantial likelihood of an immediate threat that death, serious bodily harm, or abuse of a controlled substance will occur absent an immediate suspension. A bare recitation of the statutory standard is not a reasoned explanation.

95.     The ISO runs counter to the evidence. The Patient Files demonstrate that Plaintiff appropriately evaluated, treated, and monitored the four patients identified in the ISO, and the leading expert in the field of TRT has reviewed those records and concluded that Plaintiff's prescribing of TRT for those patients was appropriate.

96.     The ISO entirely fails to consider an important aspect of the problem: the current scientific evidence. It is this evidence that forecloses any claim that the monitored prescribing of FDA-approved testosterone presents an immediate threat of death, serious bodily harm, or abuse.

97.     Even if the DEA's citation to 49 Pa. Code § 16.92(a)(1) and (a)(4), and its generic identification of five categories of alleged deficiency as to the four patients, is credited in full, that citation does not cure the ISO's failure to make the findings § 824(d) requires. A citation to a state examination-and-documentation regulation is not a reasoned finding that Plaintiff's continued registration presents a substantial likelihood of an immediate threat of death, serious bodily harm, or abuse of a controlled substance. Purported deficiencies in documentation or recordkeeping, even if ultimately established, bear on regulatory compliance under state law, not on whether patients face an imminent threat to their health or safety.

98.     The ISO treats a legitimate difference in clinical judgment, of the very kind the governing clinical guidelines expressly contemplate, as though it were evidence of unlawful prescribing or diversion. It is not. Plaintiff will prove it is not. Defendants will never be able to carry their burden that Plaintiff's prescribing poses the requisite risk of immediate harm.

99.     The DEA entirely failed to consider obvious, less drastic alternatives, including proceeding by an order to show cause with a pre-deprivation hearing under 21 U.S.C. § 824(c), or limiting any suspension to testosterone pursuant to 21 U.S.C. § 824(b) and 21 C.F.R. § 1301.36(g), rather than suspending Plaintiff's authority as to all controlled substances.

25

100.    As a direct and proximate result of Defendants' unlawful action, Plaintiff has suffered and continues to suffer irreparable harm, including the loss of his ability to perform his job at Company-1 and injury to his professional reputation.

101.    The ISO must therefore be held unlawful, set aside, vacated, and dissolved. 5 U.S.C. §§ 705, 706(2)(A); 21 U.S.C. § 824(d)(1).

## COUNT II

## VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT (U.S. CONST. AMEND. V; 5 U.S.C. § 706(2)(B))

102.    Plaintiff incorporates by reference the allegations at paragraphs 1 through 90 as though fully set forth herein.

103.    The Due Process Clause of the Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

104.    Plaintiff possesses a constitutionally protected property interest in his DEA COR, which is essential to his employment and to his ability to practice in his chosen profession, as well as a protected liberty interest in pursuing his occupation.

105.    A fundamental requirement of due process is notice and an opportunity to be heard at a meaningful time and in a meaningful manner. Ordinarily, the opportunity to be heard must precede the deprivation.

106.    Summary deprivation of a protected interest without a prior hearing is tolerated only in extraordinary situations involving a genuine emergency.

107.    No genuine emergency exists here. As set forth above, the ISO rests on a conclusory assertion of "imminent danger" unsupported by any factual findings. The underlying dispute is based on a post hoc file review from an undisclosed expert that has been flatly refuted

26

by a leading expert practitioner in the field of TRT, and concerns a medication whose safety has been confirmed by the most rigorous available scientific evidence.

108.    Nor does the statutory scheme, as applied to Plaintiff, afford prompt post-deprivation review.  Under 21 U.S.C. § 824(d)(1), the suspension remains in effect "until the conclusion of such proceedings, including judicial review thereof."

109.    Defendants have therefore deprived Plaintiff of protected property and liberty interests without due process of law in violation of Plaintiff's constitutional rights and  5 U.S.C. § 706(2)(B).

## COUNT III

### AGENCY ACTION IN EXCESS OF STATUTORY AUTHORITY

### (5 U.S.C. § 706(2)(C))

110.    Plaintiff incorporates by reference the allegations at paragraphs 1 through 90 as though fully set forth herein.

111.    The APA directs a reviewing court to hold unlawful and set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

112.    Section 824(d) conditions the DEA's extraordinary power of summary suspension upon a finding, supported by facts, that the registrant's continued registration presents an "imminent danger to the public health or safety," as that phrase is defined in 21 U.S.C. § 824(d)(2). That finding is a statutory prerequisite to, and limitation upon, the agency's authority to act without notice and a hearing.

113.    Because the ISO issued without any supported finding of imminent danger, Defendants acted in excess of the authority Congress conferred upon them.

27

114.    Separately, the CSA does not authorize the DOJ or the DEA to define or enforce standards of medical practice, which are matters committed to state regulation.

115.    Defendants acted outside the scope of their statutory authority by suspending Plaintiff's registration based solely on the DEA-retained expert's view of the standard of care for TRT and unsupported allegations of prescribing outside the usual course of professional practice. Defendants provided no evidence of diversion or unlawful prescribing and glossed over in a conclusory manner the imminent-danger finding required under 21 U.S.C. § 824(d)(2).

116.    The DEA's reliance on 49 Pa. Code § 16.92—a state regulation governing the examinations and documentation a practitioner must undertake before prescribing controlled substances—confirms rather than cures this defect.    Enforcing compliance with a state examination-and-recordkeeping standard is a task Congress left to Pennsylvania's licensing authorities, not to the DEA's emergency suspension power.

117.    The ISO therefore must be held unlawful, set aside, vacated, and dissolved.

## COUNT IV

### DECLARATORY JUDGMENT (28 U.S.C. §§ 2201–2202)

118.    Plaintiff incorporates by reference the allegations at paragraphs 1 through 90 as though fully set forth herein.

119.    An actual and justiciable controversy exists between Plaintiff and Defendants concerning the lawfulness of the ISO and the parties' respective rights and obligations under the CSA, the APA, and the United States Constitution.

120.    Plaintiff is entitled to a declaration that the ISO was issued without lawful authority, is arbitrary and capricious, and violates the Fifth Amendment, and that his DEA COR remains valid and in full force and effect.

121.    A declaratory judgment will serve a useful purpose in clarifying and settling the legal relations at issue and will afford relief from the uncertainty giving rise to this proceeding. 28 U.S.C. §§ 2201–2202; Fed. R. Civ. P. 57.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants, and award the following relief:

1. Declare, pursuant to 28 U.S.C. § 2201, that the ISO is unlawful, arbitrary and capricious, in excess of Defendants' statutory authority, and contrary to the Fifth Amendment to the United States Constitution;

2. Hold unlawful, stay, set aside, and vacate the ISO, pursuant to 5 U.S.C. § 706(2);

3. Dissolve the ISO, pursuant to 21 U.S.C. § 824(d)(1);

4. Preliminarily and permanently enjoin Defendants, and all persons acting under their direction or control, from enforcing or giving effect to the ISO, and direct Defendants to restore Plaintiff's Certificate of Registration to full force and effect;

5. Award Plaintiff his costs and reasonable attorneys' fees; and

6. Grant such other and further relief as the Court deems just and proper.

Dated: July 23, 2026

Respectfully submitted,

**ARMSTRONG & BRADYLYONS PLLC**          **SAUL EWING LLP**

Scott Armstrong*                         */s/ Justin C. Danilewitz*
4315 50th Street, NW                     Justin C. Danilewitz, Esq. (269612021)
Washington, D.C. 20016                   1735 Market Street, Suite 3400
(202) 803-7907                           Philadelphia, PA 19103
Scott@abdclegal.com                      (215) 972-7777
                                         (215) 972-7725 (fax)
Drew Bradylyons*                         Justin.Danilewitz@saul.com
4315 50th Street, NW
Washington, D.C. 20016                   Ashley Campbell (334029)
(202) 618-8918                           1735 Market Street, Suite 3400
Drew@abdclegal.com                       Philadelphia, PA 19103
                                         (215) 972-7786
                                         (215) 972-7725 (fax)

*\* Pro hac vice application pending*
                                         Date: July 23, 2026